MARCELLA J. SLAUGHTER, Administratrix of WM. M. SLAUGHTER, deceased, plaintiff in error, vs. BRYANT A. CULPEPPER and MATTHEW J. D. CULPEPPER, Executors of DAVID W. CULPEPPER, deceased, defendants in error.

Slaughter et. al. vs. Culpepper et. al.

[1.] The Ordinance of 1865, on the subject of adjusting certain contracts upon the principles of equity, does not impair the obligation of contracts, and thereby violate the Constitution of the United States. It changes a rule of evidence; and, in so doing, is within the sphere of ordinary legislative competency. Whether the Convention that passed it had only *political* power, restricted to the creation of *fundamental, organic* law, was not, in this case, made a question, and is, therefore, left undecided.

[2.] Juries can neither make contracts for parties, nor mould at pleasure those which they have made for themselves. They should, in administering the Ordinance of 1865, ascertain, from the evidence, fairly and honestly, what was, or must have been, the contract really made by the parties, and not substitute therefor any caprice or more will o their own.

[3.] The verdict in the present case appearing to be contrary to the evidence, and grossly unjust, a new trial was granted.

Motion for new trial. In Dougherty Superior Court. Decided by JUDGE HANSELL. At Chambers, July, 1866.

Upon a rule nisi to foreclose a mortgage on land, granted at the instance of Culpepper's executors, against Slaughter's administratrix, a trial by jury was had in Dougherty Superior Court. The mortgage bore date December 5th, 1861, and was made to secure the payment of two promissory notes, of the same date, for $7.875 each, one of them due January 1, 1863, and the other January 1, 1864, the latter bearing interest from January 1, 1863. It would seem, from the evidence, that these notes were given for land, sold at executor's sale, by the mortgagees, to Wm. M. Slaughter, the mortgagor.

It was in proof that the land sold low; that nothing was said as to the kind of currency in which it was to be paid for; that money was scarce; that the circulating medium at that time was bank bills; and that the person who cried the sale had never, until that day, seen any Confederate money, and then saw only one note, which a soldier, just returned from the army, paid to him. There was other evidence, but none which materially varied the foregoing.

The jury found for the mortgagees only $11.812.50.

Whereupon the mortgagees moved the Court for a new trial, on several grounds; among them, because the verdict was contrary to equity, and contrary to evidence.

Slaughter et. al. vs. Culpepper et. al.

The presiding Judge granted a new trial, and this is assigned as error.

LYON & IRVIN, and DAVIS, for plaintiff in error.

STROZIER & SMITH, for defendants.

HARRIS, J.

[1.] By an assignment of error, upon the charge of the Judge before whom this case was tried, we are called upon to express an opinion, as to the constitutionality of an Ordinance of the Convention which assembled in November, 1865, to revise and amend the Constitution of Georgia. It is entitled, "An Ordinance to make valid contracts entered into and executed during the war against the United States, and to authorize the Courts of this State to adjust the equities between parties to contracts made but not executed, and to authorize settlements of such contracts by persons acting in a fiduciary character."

By the second Section thereof, it was ordained, "that all contracts made between the first day of June, 1861, and the first day of June, 1865, whether in writing, expressed or implied, or existing in parol, and not yet executed, shall receive an equitable construction, and either party, in any suit for the enforcement of any such contract, may, upon the trial, give in evidence the consideration and the value thereof at any time, and the intention of the parties as to the particular currency in which payment was to be made, and the value of such currency at any time; and the verdict and judgment shall be on principles of equity."

It has been argued that this clause of the Ordinance is violative of that prohibition in the Constitution of the United States, which forbids any State from passing any law " impairing the obligation of contracts."

We cannot think this clause of the Ordinance obnoxious to the objection. It does no more, really, than change a

rule regulating the admission of testimony in Courts of law : it removes the obstacles created by technical rules to a full enquiry into, and investigation of, executory contracts made within the periods of time mentioned.    It is apprehended, that to have done this, was within the competency of the Legislative power, itself, at any time.    Who is prepared to deny that the Legislature may not, at its discretion, alter and amend old rules of evidence,—establish new ? Who, that it may not obliterate all distinctions which now characterize modes of procedure in Courts of law and Courts of equity, and to command, if they so enact, that the broad and liberal principles upon which justice is administered on the Equity side of our Superior Courts, shall apply to and control the verdicts of juries on its law side ?

The Ordinance was intended to do, in this matter, what we think the Legislature could have done.    As no question, as to the extent of the *Legislative* power of a Convention— whether its power is other than political, and comprehending *only fundamental, organic law*—was made or discussed, we will not enter into this profound and high enquiry, but hold the Legislative power of the Convention as competent to pass such an Ordinance as that under consideration.

[2] We cannot think that, by allowing evidence to be gone into as to the consideration of a contract, and the value at any time, and the intention of the parties as to the particular currency in which payment was to be made, and the value of the currency at any time, the Convention designed to allow juries to scale, or cut down contracts, or to regulate and fix them, by any caprice or will of their own.    Looking to the distress of the country, loss of property by the war, etc., to have authorized these, would have invested them with the power to make contracts for parties, a power which no Legislature or Convention could confer; such power conferred, would be palpably unconstitutional.    When juries attempt to make contracts for parties, or mould existing ones to suit their pleasure, they do impair their obligation, and such verdicts should be set aside.

As we interpret this Section of the Ordinance, the Convention meant to authorize the jury, from all the evidence by it permitted, to ascertain, fairly and honestly, what was, or must have been, the contract the parties made.   Let us attempt to illustrate this idea.   If it was a contract expressed to be paid in Confederate currency at a distant time, or if without any specification on its face to be paid in currency, but simply for the payment of so many dollars and cents, the jury should enquire into the consideration, what was sold, and its supposed fair value at the time of sale, in a currency at or near at par with gold or silver, or in gold or silver, so long as they furnish a fair standard of value, and have not become a mere marketable commodity, increasing in value from their scarcity, the increase of price stipulated for in consequence of the then existing depreciation of currency at the time of the contract, and from these, and all othes facts, or circumstances, which can assist them in getting at the truth of the contract, should consider and equitably apply them in making up their verdict.

It occurs to me (and I utter this only as my individual opinion) that no man, in making a sale of property on time, or by annual installments, during the late civil war, ever thought or intended to take the risk of a currency swelling daily in volume, and resting upon no metalic or other solid basis, and that risk to be incurred for legal interest only.   A man so acting could be classed only with the insane.   A person selling on time, no doubt, either agreed or meant to receive the currency existing at the time of payment, but at its then market value, as compared with the value of the currency when the contract was made.   The creditor is fairly entitled to that difference, upon every principle of equity prescribed.   The natural equity which the understanding approves, the impulse of an honest heart which prompts man to do as he would be done by, alike unite in sanctioning this measure of justice.

[3]  By an examination of the record brought up, it appears that the executors sold the lands of Culpepper's estate, say

two thousand acres, on the 5th December, 1861, on a credit of one and two years, for the sum of $15,750, in two equal payments. No Confederate currency was then in circulation in that quarter of the State; the few notes which had been seen there were held as "curiosities." Bank notes, those of the chartered banks of Georgia chiefly, constituted the entire circulating medium. It is a well known fact, (such is my recollection,) that all the banks at that time, save the Middle Bank of Georgia, had suspended specie payments; their notes were, consequently, depreciated in market, as compared with gold and silver, varying in the brokers' tables from four to nine per cent. discount.

Now, in the silence, on the day of sale, as to the medium in which payment was to be made, we are at a loss to discover how the jury could consider any question as to Confederate notes, there being none in circulation there. Under the testimony, they were restricted to the question, whether the notes of Slaughter were to be paid in gold and silver, or in bank notes; if in the latter, that being the circulating medium there, at what depreciation at the time of the sale, as compared with gold and silver.

If the jury, in this case, had reduced the amount of the debts sued, according to the depreciation of bank notes, as existing in December, 1861, their verdict should not have been disturbed. But, on what principle, and on what data, a debt of near twenty thousand dollars, principal and interest, has been cut down to $11,812, I cannot discover.

The verdict in this case is unauthorized by the testimony, and seems to be grossly unjust. We therefore affirm the judgment granting a new trial.

Since writing out the foregoing opinion, I see, by a newspaper paragraph, that Chancellor Lesnesne, of South Carolina, has held, in reference to contracts made during the civil war in *Confederate* currency, that they are to be discharged on the basis of the value of that currency, as compared with gold, *at the time* the debt was incurred, and consideration given therefor.